# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF MASSACHUSETTS

## EASTERN DIVISION

| | |
|---|---|
| **In re**<br><br>**ERNEST J. FELICE and MICHELLE FELICE,**<br><br>                    **Debtors**<br>───────────────────<br>**HAROLD B. MURPHY,**<br><br>                         **Plaintiff**<br><br>**v.**<br><br>**ERNEST J. FELICE, MICHELLE FELICE, DANIELLE J. FELICE and ERNEST O. FELICE in his individual capacity and as Trustee of the Ernest O. Felice Family Trust,**<br><br>                    **Defendant** | **Chapter 7**<br>**Case No. 07-17589-FJB**<br><br><br><br>**Adversary Proceeding**<br>**No. 08-01355** |

### MEMORANDUM OF DECISION

I.      **INTRODUCTION**

This is an action by the chapter 7 trustee against debtor Ernest J. Felice, his sister, and his father to establish the bankruptcy estate's interest in certain family trusts; in the final count, the trustee also objects to the debtors' discharge.  The issues before the Court are, as to each count, (1) whether the bankruptcy court has authority under 28 U.S.C. § 157 to enter a final order; (2) whether that authority is consistent with Article III of the United States Constitution; and (3) whether the defendants are entitled to a jury trial.

II.      **BACKGROUND FACTS and PROCEDURAL HISTORY**

Ernest J. Felice ("Ernest") and Michelle Felice ("Michelle") (together, the "Debtors") filed a joint petition for relief under chapter 7 of the Bankruptcy Code on November 28, 2007.  On their initial bankruptcy schedules, the Debtors listed no real property.  On May 3, 2010, they amended Schedule A to include Ernest's life estate in real property located at 20 Mandalay Drive, Peabody, Massachusetts ("Mandalay Drive").  The Debtors stated that the listing of Mandalay Drive was "for information and disclosure purposes only as the asset is NOT property of the estate[.]"  The chapter 7 trustee, Harold B. Murphy (the "Trustee"), disagreed with this characterization and commenced the present action against the Debtors, Ernest's father, Ernest O. Felice ("Ernest Senior"), and Ernest's sister, Danielle Felice ("Danielle") (collectively, the "Defendants").  Except as noted below, the following facts appear undisputed.

Ernest Senior and his wife, Phyllis Felice ("Phyllis"), owned Mandalay Drive as tenants by the entirety.  On September 21, 1981, Ernest Senior created the Felice Realty Trust (the "1981 Realty Trust"), naming himself as trustee and Phyllis as beneficiary.  That same day, the couple deeded Mandalay Drive to Ernest Senior as trustee of the 1981 Realty Trust.  On January 10, 2001, following his wife's death, Ernest Senior transferred 100 percent of the beneficial interest in the 1981 Realty Trust to himself.  The 1981 Realty Trust contained a provision providing for its self-termination on September 21, 2001.

On September 27, 2001, Ernest Senior's children, Ernest and Danielle, created two trusts: the Ernest O. Felice Realty Trust (the "2001 Realty Trust") and the Ernest O. Felice Family Trust (the "Family Trust").  Ernest and Danielle are co-trustees of both trusts and co-beneficiaries of the Family Trust.  The 2001 Realty Trust holds Mandalay Drive for the benefit of the Family Trust.

The same day his children created the 2001 Realty Trust and Family Trust, Ernest Senior deeded Mandalay Drive to Ernest and Danielle as trustees of the 2001 Realty Trust, subject to a reserved life

estate in the property for himself.[1]  The parties agree that the deed that transferred Mandalay Drive

from the 1981 Realty Trust to the 2001 Realty Trust contains a scrivener's error.  It identifies the grantor

as "Ernest O. Felice, as trustee of the Ernest O. Felice Family Trust."  It should have read "Ernest O.

Felice, as trustee of the Felice *Realty* Trust" because, as of September 27, 2001, Ernest Senior still held

Mandalay Drive in his capacity as trustee of the 1981 Realty Trust.[2]  The Family Trust's beneficial interest

in Mandalay Drive inured to the Family Trust's co-beneficiaries, Ernest and Danielle.[3]  The Family Trust

contains a "Spendthrift Clause" prohibiting Ernest and Danielle from selling, pledging, or transferring

their interests in the trust and removing their interests from the reach of creditor process.

On January 14, 2003, Ernest and Danielle executed a First Amendment to the Family Trust,

granting Ernest 75% of the beneficial interest and Danielle, 25%.  The First Amendment provided that

Danielle would automatically forfeit her interest if she ceased using the second floor of Mandalay Drive

as her primary residence.[4]  The Trustee alleges Danielle has done just that.  The Defendants neither

admit nor deny this and the factual allegations on which it is founded.

On January 28, 2008, Ernest executed a Second Amendment to the Family Trust.  This occurred

after he filed bankruptcy and without permission of the Court.  The Second Amendment gave Ernest and

Danielle each a 50% beneficial interest in the Family Trust.

On April 30, 2008, Ernest and Michelle signed an affidavit (the "2008 Affidavit") under penalty of

perjury in which they averred:  "Neither of us are aware of who the beneficiaries of the Ernest O. Felice

---

[1] The parties dispute whether Ernest Senior was also a settlor of the Family Trust.

[2] In their Motion to Dismiss, the Defendants argue that because the 1981 Realty Trust expired by its own terms on September 21, 2001—six days before Ernest Senior executed the deed—the conveyance from the 1981 Realty Trust to the 2001 Realty Trust was defective.

[3] A third sibling was also a beneficiary of the Family Trust until his death on November 3, 2002.  Since then Ernest and Danielle have been the only beneficiaries of the Family Trust.

[4] *See Amended Complaint, Exh. F, "Ernest O. Felice Family Trust, Second Amendment of Trust II."*  Although this document is titled the "Second Amendment of Trust," a subsequent amendment, executed in 2008, is also titled the Second Amendment.  The amendment executed in 2003 appears by all accounts to be the first amendment to the Family Trust.

Trust are.  Neither of us have ever been informed by Ernest O. Felice of (sic) anyone else that either of us are beneficiaries of this trust."

On November 21, 2008, the Trustee commenced the present adversary proceeding.  In his Amended Complaint (hereinafter "Complaint"), the Trustee seeks: (1) a declaration that Ernest held a 100 percent beneficial interest in the Family Trust at the time he and Michelle filed bankruptcy and, consequently, that Ernest owns Mandalay Drive subject to the life estate of Ernest Senior; (2) a declaration that Ernest's interest in Mandalay Drive is property of the Debtors' bankruptcy estate pursuant to 11 U.S.C. § 541; (3) reformation of the deed executed by Ernest Senior that purportedly transferred Mandalay Drive into the 2001 Realty Trust; (4) avoidance and recovery for the benefit of the estate of Ernest's post-petition transfer of one-half of his beneficial interest to his sister Danielle; (5) a declaration that the Debtors have no claim of exemption in Mandalay Drive; and (6) denial of the Debtors' discharge.[5]  In response, the Defendants argue that by virtue of the Spendthrift Clause in the Family Trust and § 541(c)(2) of the Bankruptcy Code, Ernest's interest in Mandalay Drive is excluded from property of the estate.  On May 3, 2010, the Debtors filed a motion in the adversary proceeding for "Determination that the Debtor's Beneficial Interest in Various Trust Documents is not an (sic) Property of the Estate, Due to the Spendthrift Clause Contained Therein" (the "Defendants' Motion").  The Trustee filed a cross-motion for summary judgment.

On September 20, 2010, after a hearing on the Defendants' Motion and the Trustee's Cross-Motion for Summary Judgment, I ordered the parties to file briefs addressing the following issues for each count of the complaint: (1) whether the relief requested constitutes a "core" proceeding under 28 U.S.C. § 157; and (2) whether the Defendants have a right to a jury trial under the Seventh Amendment. The Trustee filed his response, arguing that each count is a core proceeding and that no count carries a right to a jury trial.  The Defendants have filed the required brief, but theirs sets forth no arguments

---

[5] The Trustee's Complaint also contains three counts for avoidance based on fraudulent transfer, which counts the parties later dismissed by stipulation.  *See* Docket No. 90.

regarding the Court's jurisdiction under 28 U.S.C. § 157.  In a separate document, their Statement in

Compliance with Pretrial Order, the Defendants clearly stated that they do not consent to the

bankruptcy court's entering final judgment on any count it determines to be "non-core."  The

Defendants did brief the jury issue, but in doing so they treated the Complaint as if it were one to

recover specific real property under a fraudulent conveyance theory.  The Defendants argue that since

such an action has historically been brought at common law, the Seventh Amendment guarantees them

a right to a jury trial.

III.    **DISCUSSION**

First, in view of the record of proceedings and the relief requested by the Defendants, this

Court, pursuant to 28 U.S.C. § 157(b)(3), must determinate whether the claims made by the Trustee in

this adversary proceeding are "core" or "otherwise related to" the Debtors' case under title 11.  Second,

in light of the Supreme Court's decision in *Stern v. Marshall*, 564 U.S. __, 131 S. Ct. 2594 (2011), I

recognize that even if a proceeding is "core" under § 157, a bankruptcy judge may not have

constitutional authority to enter a final order on it.  *See Siegel v. FDIC (In re Indymac Bancorp Inc.)*, 2011

WL 2883012 at *6 (C.D. Cal. July 15, 2011) (after *Stern*, "it is insufficient to simply meet Congress's

definition of core under § 157(b)(2)(C)").  Accordingly, I must determine a bankruptcy judge's

constitutional authority to do so.  And third, the Defendants having generally demanded a trial by jury, I

must determine whether they are entitled to one under the Seventh Amendment to the Constitution.

The Court must address each of these issues with respect to each count of the Complaint.

A.    **The Extent of Ernest's Interest in Mandalay Drive and Whether Such Interest is Property of the Estate**

Count I involves two separate issues:  (1) whether Ernest's interest in Mandalay Drive is property

of the bankruptcy estate; and (2) the extent of his interest on the petition date.  I must analyze

jurisdiction and the right to a jury trial separately with respect to each issue.

1. **Determining Whether Ernest's Beneficial Interest in the Family Trust Constitutes Property of the Estate**

Pursuant to section 541(a)(1) of the Bankruptcy Code,[6] all legal and equitable interests of a debtor in property as of the commencement of the case become property of the estate.  This general rule is subject to the exception set forth in § 541(c)(2), which excludes from the estate a debtor's beneficial interest in a trust if the trust contains a restriction on the transfer of that interest that would be enforceable under "applicable nonbankruptcy law."  *See Lassman v. Tosi (In re Tosi)*, 383 B.R. 1, 10 (Bankr. D. Mass. 2008) ("Section 541(c)(2) of the Bankruptcy Code carves out an exception to section 541(a)(1).").  If a restriction on the transfer of a beneficial interest is *unenforceable* at state law, § 541(c)(2) does not apply, and the beneficial interest is property of the estate.

In this case, the Defendants argue that the Spendthrift Clause in the Family Trust restricts Ernest's ability to transfer his beneficial interest and, therefore, that his interest in Mandalay Drive is excepted from property of the estate by § 541(c)(2).  The Trustee counters that the Spendthrift Clause is unenforceable under Massachusetts law due to the "self-settled" nature of the Family Trust and, consequently, that Ernest's interest in Mandalay Drive is property of the estate under § 541(a)(1).

(a)  **Authority of the Bankruptcy Court to Enter a Final Judgment**

(i)  **Statutory Authority under 28 U.S.C. § 157**

The issue presented is whether a bankruptcy judge has statutory authority under 28 U.S.C. § 157 to enter a final judgment regarding whether the Spendthrift Clause in the Family Trust excludes Ernest's interest in Mandalay Drive from property of the estate.  A bankruptcy judge is authorized to hear and determine all core proceedings arising under title 11 or arising in a case under title 11 and to enter appropriate orders and judgments in those proceedings.  28 U.S.C. § 157(b)(1).  A bankruptcy judge may also hear a proceeding that is not core but "otherwise related to" the bankruptcy case—colloquially

---

[6] 11 U.S.C. § 101 *et seq.*

termed a "non-core" proceeding—and submit proposed findings of fact and conclusions of law to the

district court for entry of final order or judgment.  The statute does not define "core," though §

157(b)(2) provides a non-exhaustive list of core proceedings.[7]  In general, a proceeding is core if it

relates to a function essential to the administration of the bankruptcy case.  *See McCabe v. Braunstein*

*("Braunstein II")*, 439 B.R. 1, 7 (Bankr. D. Mass. 2010).  Non-core proceedings involve controversies that

do not depend on the bankruptcy laws for their existence and could proceed in another court in the

absence of bankruptcy.[8]

The count to determine the status of Ernest's interest in the Family Trust is a core proceeding

under 28 U.S.C. § 157(b)(1) because this controversy would not exist outside of bankruptcy.  Unlike a

non-core proceeding, determining the extent of property of the estate is a proceeding that can only

arise under the Bankruptcy Code.  *See Braunstein II*, 439 B.R. at 7 (noting that non-core proceedings are

state or federal claims which could survive outside of bankruptcy and, in the absence of bankruptcy,

would have been initiated in a state or federal district court).  The present controversy is created by §

541 of the Code.  Section 541(a)(1) provides the Trustee's basis for including Mandalay Drive in the

bankruptcy estate.  The Defendants' only recourse for excluding it lies in § 541(c)(2).  The fact that

Massachusetts law will decide the outcome is not dispositive of whether the proceeding is core or non-

core.  Routine bankruptcy decisions in core proceedings are often based on rights created at state law.[9]

A controversy that could exist outside of bankruptcy is not the same as a *right* which exists outside of

bankruptcy but is relevant inside bankruptcy.  Put simply, by operation of § 541 of the Bankruptcy Code,

---

[7] *See* 28 U.S.C. § 157(b)(2)(A)-(P).

[8] "A proceeding will not be considered 'core,' even if it falls within the literal language of § 157(b) if it is a state law claim that could exist outside of bankruptcy and is not inextricably bound to the claims allowance process or a right created by the Bankruptcy Code."  *Sheridan v. Michels (In re Sheridan)*, 362 F.3d 96, 108-09 (1st Cir. 2004), *quoting Bethlahmy v. Kuhlman (In re ACI-HDT Supply Co.)*, 205 B.R. 231, 236 (B.A.P. 9th Cir. 1997).

[9] "'Property interests are created and defined by state law,' and '[u]nless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.'" *Stern*, 131 S.Ct. at 2616, *quoting Butner v. United States*, 440 U.S. 48, 55 (1979).

the filing of a bankruptcy petition creates an estate that either includes Ernest's beneficial interest in the Family Trust or does not.  A proceeding to determine whether § 541 brings a particular asset of the debtor into the estate is a core proceeding within the meaning of § 157(b).

### (ii)   Constitutional Authority

The Supreme Court's decision in *Stern v. Marshall* recognized constitutional limitations on the bankruptcy court's authority under § 157(b) to enter final orders.  *See* 131 S. Ct. at 2618.  In *Stern*, the Court held that a bankruptcy judge lacked constitutional authority to decide a debtor's counterclaim despite having statutory authority to do so under 28 U.S.C. § 157.  *See id.* at 2620.  Since my authority to enter final judgment on the Trustee's claims in this case comes from the same statute, I must decide whether the Constitution allows me to render a final judgment.

The long travel of the dispute between Vickie Lynn Marshall and her stepson, E. Pierce Marshall, that led to the Supreme Court's decision in *Stern* is recounted in numerous cases and legal articles.[10] Vickie, better known to the world as Anna Nicole Smith, widow to the Texas multi-millionaire J. Howard Marshall, filed a bankruptcy case in California.   Pierce filed a proof of claim against her bankruptcy estate, alleging her lawyers had defamed him in the press.  Vickie counterclaimed against Pierce, alleging he had tortiously interfered with a monetary gift she expected to receive from her late husband. Although the bankruptcy court ruled in her favor, the Supreme Court held that the bankruptcy judge lacked the constitutional authority to enter the judgment because doing so required the exercise of the judicial power of the United States.  *See id.* at 2620.

Article III of the Constitution states that the "judicial power" of the United States shall be vested in "one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish."  U.S. CONST. art. III, § 1.  The judges of these "Article III" courts "shall hold their Offices during

---

[10] *See, e.g.,* S. Todd Brown, *Constitutional Gaps in Bankruptcy*, 20 Am. Bankr. Inst. L. Rev. 203-09 (2012).

good Behavior, and shall . . . receive for their Services a Compensation which shall not be diminished

during their Continuance in Office." *Id.*   A bankruptcy judge is not an Article III judge.  A bankruptcy

judge for a particular district is appointed by the court of appeals for the circuit in which the district is

located, and the term of appointment is fourteen years.  *See* 28 U.S.C. § 152.[11]  Congress has set the

salary of bankruptcy judges by statute, 28 U.S.C. § 153(a), and may diminish it by amending the statute.

For lack of Article III status, a bankruptcy judge cannot enter a final order or judgment in any proceeding

if doing so would require exercise of the judicial power of the United States.  *See Northern Pipeline v.*

*Marathon Pipe Line Co.* 458 U.S. 50, 52 (1982); *accord Stern*, 131 S. Ct. at 2609 ("When a suit is made of

'the stuff of the traditional actions at common law tried by the courts at Westminster in 1789,' and is

brought within the bounds of federal jurisdiction, the responsibility for deciding that suit rests with

Article III judges in Article III courts.") (internal citation omitted).

In *Northern Pipeline*, the Supreme Court identified three instances where the judicial power of

the United States may be exercised by non-Article III tribunals:  (1) territorial courts; (2) courts-martial;

and (3) cases involving "public rights."  Of these three, only the "public rights" exception is arguably

applicable to bankruptcy courts within the United States.[12]  *See id.* at 64-68.  The Supreme Court first

articulated the "public rights" doctrine in *Murray's Lessee v. Hoboken Land & Improvement Co.  See* 59

U.S. 272, 284 (1855).  The Court noted that Congress may not withdraw matters which are the subject of

---

[11] The congressional designation of Article III judges to appoint bankruptcy judges is explicitly provided for in the Constitution.  Article II, Section 2 provides that "Congress may by law vest the appointment of such inferior officers, as they think proper . . . in the Courts of Law."  *U.S. CONST. art. II*, § 2.

[12] The plurality in *Northern Pipeline* distinguished territorial courts and courts-martial from bankruptcy courts.  A court-martial is clearly a different court entirely.  Territorial courts exist in areas of governance where the Executive and Legislative branches have extraordinary control over the subject matter at issue.  In particular, Article IV of the Constitution gives Congress broad powers of governance over the territories, including the power to create courts independent of Article III limitations.  *See American Ins. Co. v. Canter*, 26 U.S. 511, 546 (1828) (affirming the use of judicial power and entry of a final judgment by a federal judge appointed to a four-year term in the then-territory of Florida because "[a]lthough admiralty jurisdiction can be exercised in the states in those Courts, only, which are established in the pursuance of the 3d article of the Constitution; the same limitation does not extend to the territories.  In legislating for them, Congress exercises the combined powers of the general, and of a state government.").  Because I sit in a federal bankruptcy court located within the Commonwealth of Massachusetts, which is a state and not a territory, Article III limits what Congress may authorize me to decide.

a suit at common law, equity, or admiralty from Article III courts. *See id.* The Court recognized,

however, that there are other matters involving "public rights . . . , which are susceptible of judicial

determination, but which congress may or may not bring within the cognizance of [Article III courts]."

*See id.*

The Supreme Court has considered the "public rights" doctrine in the context of bankruptcy

three times since the Bankruptcy Act of 1978 created the modern bankruptcy court and the office of

bankruptcy judge. Each time, the Court did not find a "public rights" exception that would allow the

bankruptcy judge to decide the proceeding at issue,[13] yet expressly declined to consider whether "public

rights" might arise in other facets of restructuring debtor-creditor relations in bankruptcy.[14] In *Stern*,

the Court acknowledged that the "public rights" exception might allow a non-Article III tribunal to

adjudicate a dispute between two private individuals, but only if the claim at issue derives from a federal

regulatory scheme, or requires resolution by an expert government agency to serve a limited regulatory

objective within the agency's authority. *See* 131 S. Ct. at 2613. The claim at issue in *Stern* did not "fall

within any of the varied formulations of the public rights exception." *Id.* at 2614.

Following the Supreme Court's decision in *Stern*, Bankruptcy Judge Jeffrey Hughes analyzed the

"public rights" doctrine with erudition in *Meoli v. Huntington Nat'l Bank (In re Teleservices Group, Inc.)*,

456 B.R. 318, 328-32 (Bankr. W.D. Mich. 2011). After providing a brief summary of the proceeding at

---

[13] *See Stern*, 131 S. Ct. at 2601 (proceeding to determine creditor's liability to debtor for tortious interference with
a gift); *Granfinanciera v. Nordberg*, 492 U.S. 33, 56 (1989) (holding that a fraudulent conveyance action was a
private right, and therefore, the defendant was entitled to a trial by jury); *Northern Pipeline*, 458 U.S. at 56
(proceeding to determine private party's liability to debtor for breach of contract).

[14] *See Northern Pipeline*, 458 U.S. at 71 ("[T]he restructuring of debtor-creditor relations, which is at the core of the
federal bankruptcy power, must be distinguished from the adjudication of state-created private rights, . . . The
former may well be a 'public right,' but the later obviously is not."); *Granfinanciera*, 492 U.S. at 56 n.11 ("We do
not suggest that the restructuring of debtor-creditor relations is in fact a public right . . . and we need not and do
not seek to defend [this thesis] here."); *Stern*, 131 S. Ct. 2614 n.7 (explaining that *Granfinanciera* declined to
consider the "public rights" exception beyond whether it allowed a bankruptcy judge to decide a fraudulent
conveyance action despite the defendant's demand for a jury trial and commenting, "[b]ecause neither party asks
us to reconsider the public rights framework for bankruptcy, we follow the same approach here").

issue in *Murray's Lessee*,[15] Judge Hughes highlighted the link between Article III's limitation on who may

exercise the judicial power of the United States and the Fifth Amendment's guarantee of due process.

*Murray's Lessee* is, first and foremost, a case concerning whether a person received due process before

the government took his property. The Supreme Court only mentions "public rights" towards the end of

its opinion and only in response to a specific argument made by the losing party.[16] *See Murray's Lessee*,

59 U.S. at 282. The Fifth Amendment provides that no person shall be deprived of life, liberty, or

property, without due process of law.[17] Judge Hughes notes:

> Therefore, *Murray's Lessee* is on all fours with *Stern*. Each is about
> Congress'[s] use of an extrajudicial device to recover an amount
> claimed. In *Murray's Lessee*, it was [the] treasury's summary
> proceedings against Swartwout; in *Stern*, it was a non-Article III judge's
> entry of a final judgment against the stepson. And in each instance, the
> device employed raised questions whether the person targeted was
> being denied the due process rights the [Fifth Amendment] guarantees
> through the establishment of an independent Article III judiciary.

*Teleservices*, 456 B.R. at 332. Judge Hughes points out that Article III's requirement that the judicial

power of the United States be exercised by life-tenured judges with protected salaries is not simply a

structural feature of the Judicial Branch; it is the process which is due for every judicial controversy

arising at law or equity between private citizens that comes within the jurisdiction of the federal courts.

---

[15] "The dispute arose because the federal government had employed a fellow named Swartwout to collect customs duties at the port of New York. Unfortunately, Swartwout had fallen behind on his accounting, which prompted the U.S. Treasury to not only assess Swartwout for the missing duties but also to levy and sell his property under a distress warrant issued by the solicitor of the treasury. All of this, though, was done without the benefit of any court. Therefore, when the purchaser of a particular property under the warrant attempted to evict an unwanted tenant, the tenant responded with a constitutional challenge. Specifically, 'Murray's lessee' maintained that only an Article III court could have ordered the seizure and sale of the property that the purchaser claimed." *See Teleservices*, 456 B.R. at 328.

[16] Once the Court had determined that the proceeding by which the U.S. Treasury adjudged the customs collector delinquent and levied on his property did not amount to a judicial controversy requiring the use of judicial power, it had to explain why Congress could nevertheless make the procedure subject to judicial review. Thus, the Court made the declaration that there were matters "involving public rights, which may be presented in such form that the judicial power is capable of acting on them, and which are susceptible of judicial determination, but which [C]ongress may or may not bring within the cognizance of the courts of the United States as it may deem proper." *See Murray's Lesee*, 59 U.S. at 284.

[17] U.S. CONST. amend. V.

The Supreme Court in *Murray's Lessee* understood the Fifth Amendment as limiting Congress's

legislative power:

> It is manifest that it was not left to the legislative power to enact any
> process which might be devised.  The article [i.e., the Fifth Amendment]
> is a restraint on the legislative as well as on the executive and judicial
> powers of the government, and cannot be so construed as to leave
> congress free to make any process 'due process of law,' by its mere will.

*Id.* at 330 *quoting Murray's Lessee*, 59 U.S. at 276.

Although the extent to which the "public rights" doctrine reaches into the bankruptcy system—

if it does at all—remains undefined, it is clear that the ability of a bankruptcy judge to adjudicate a

proceeding without "running afoul of the Constitution and the protections it affords through Article III"

is, to some extent, a function of whether the bankruptcy judge's adjudication of that proceeding might

deprive a party of liberty or property without due process of law.  *Id* at 324.  Judge Hughes concludes:

> [T]he question raised by the tenant in *Murray's Lessee* and the stepson in
> *Stern* is the same.  In *Murray's Lessee*, it was whether the summary
> proceeding the treasury had employed was actually an exercise of the
> judicial power protected by Article III just as the question in *Stern* was
> whether the bankruptcy court's entry of a final judgment was an exercise
> of that same protected power.  Therefore, what the Court said in the
> opening paragraphs of *Murray's Lessee* is just as true for *Stern* –*that*
> "whether these acts were an exercise of the judicial power of the United
> States, can best be considered under another inquiry," that being
> whether "the effect of the proceedings . . . [deprived] the party . . . of his
> liberty and property, 'without due process of law;' and, therefore, is in
> conflict with the fifth article of the amendments of the constitution."
> *Murray's Lessee*, 59 U.S. at 275.  And what distinguishes *Murray's Lessee*
> from *Stern* is that the Court in *Murray's Lessee* was able to find a
> historical exception to the *due process clause* whereas the Court in *Stern*
> did not even attempt to find one because there was none to be found.

*Id.* at 343.

While the Supreme Court declined to elaborate on the presence of "public rights" in bankruptcy,

its decision in *Stern* does speak to the authority of bankruptcy judges to enter final orders or judgments

pursuant to 28 U.S.C. § 157.  The bankruptcy judge in *Stern* entered a final order on a debtor's state-law

counterclaim against a creditor who had filed a proof of claim against the estate.  *See* 131 S. Ct. at 2600.

The Court held that although § 157(b)(2)(C) authorized the bankruptcy judge to decide the counterclaim,

this statutory authorization was an unconstitutional delegation of judicial power outside Article III.  *See*

*id.* at 2608.  The counterclaim was a common law tort claim, which "simply attempt[ed] to augment the

bankruptcy estate."  *See id.* at 2616.  On this point, the Court affirmed the reasoning of a prior decision

dealing with the constitutionality of bankruptcy courts, *Granfinanciera v. Nordberg*, 492 U.S. 33 (1989),[18]

stating:

> We see no reason to treat [the debtor's] counterclaim any differently
> from the fraudulent conveyance action in *Granfinanciera* [citation
> omitted].  *Granfinanciera*'s distinction between actions that seek "to
> augment the bankruptcy estate" and those that seek "a pro rata share
> of the bankruptcy res," reaffirms that Congress may not bypass Article
> III simply because a proceeding may have *some* bearing on a bankruptcy
> case; *the question is whether the action at issue stems from the
> bankruptcy itself or would necessarily be resolved in the claims
> allowance process.*

*Id.* at 2618 (emphasis added).  Therefore, despite being a "core" proceeding within the meaning

of 28 U.S.C. § 157(b)(2), final resolution of the debtor's counterclaim in *Stern* required

adjudication by an Article III judge.  *See id*.

Judge Hughes' understanding in *Teleservices* of the connection between Article III authority and

due process is consistent with the Supreme Court's view that proceedings seeking to "augment the

estate" might be beyond a bankruptcy judge's authority to decide.  *Northern Pipeline* and *Stern* use the

phrase "augment the bankruptcy estate" in reference to actions that ultimately would result in

transferring property belonging to a third party at the commencement of the bankruptcy into the

bankruptcy estate.  *See* 458 U.S. at 72 (action to determine third party's liability to debtor for breach of

---

[18] In *Granfinanciera*, the Court held that, in a fraudulent conveyance action to recover a definite sum of money, the defendant had a right to a jury trial under the Seventh Amendment.  *See* 492 U.S. at 58-59.  The Court acknowledged that Congress may deny trials by jury in cases where "public rights" are litigated.  *See id.* at 51.  The Court noted, however, that fraudulent conveyance actions are not part of the proceedings in bankruptcy but "more nearly resemble state-law contract claims brought by a bankrupt corporation to *augment the bankruptcy estate* than they do creditors' hierarchically ordered claims to a pro rata share of the bankruptcy res."  The Court concluded, "[t]hey therefore appear matters of private rather than public right."  *See id.* at 56 (emphasis added).  Limiting its holding to whether the defendants were entitled to a jury trial under the *Seventh Amendment*, the Court did not decide whether Article III permits bankruptcy judges to conduct such jury trials.  *See id.* at 64.

contract); 131 S. Ct. at 2618 (action to determine creditor's liability to debtor for tortious interference

with a gift).  In finding the bankruptcy judge's authority lacking in both cases, the Supreme Court

explicitly stated the need to protect the integrity of Article III of the Constitution.  *See, e.g., Stern*, 131 S.

Ct. at 2620 ("A statute may no more chip away at the authority of the Judicial Branch than it may

eliminate it entirely.").  But *Northern Pipeline* and *Stern* can also be read as implicitly protecting the

defendants' Fifth Amendment right to due process in proceedings affecting their property rights.  *See*

*Teleservices*, 456 B.R. at 343.  An action that successfully augments the bankruptcy estate inevitably

requires the defendant, compelled by court order if necessary, to part with money or property.  If the

defendant is a private party, then adjudication of the action requires a court authorized to exercise the

judicial power of the United States.  In this sense, due process and Article III are "fused at the hip."[19]

Professor Douglas Baird explains:

> Obtaining a judgment is the way that one private citizen can call upon
> the state to use force against another citizen to vindicate her rights.
> Authorizing the forcible seizure of property is a serious business.  It is
> the essence of the judicial power.  Because the bankruptcy judge is not
> an Article III judge, she lacks the power to authorize one citizen to take
> property away from another.  It is just as if a janitor at the courthouse
> entered the judgment.  He does not possess the judicial power either.  If
> you want authorization to take someone else's property in the federal
> judicial system on account of an ordinary debt, you need to get it from
> an Article III judge.[20]

Sweeping aside the professor's regard for my "custodial" role in the bankruptcy system, I agree that I

lack the Article III status necessary to exercise the judicial power of the United States where no

exception applies.

Although an Article III judge must decide proceedings requiring the exercise of the judicial

power of the United States for which there is no "public rights" exception, *Stern*'s distinction of

proceedings that "augment" the bankruptcy estate from those that fix creditors' entitlement to

---

[19] *See* Douglas G. Baird, *Blue Collar Constitutional Law*, 86 Am. Bankr. L. J., 3, 5 (2012).

[20] *Id.*

distribution from the estate suggests that not all bankruptcy proceedings necessarily require an exercise

of judicial power.  "Congress, without question, has the ability under its authority to enact uniform

bankruptcy laws to incorporate into the Bankruptcy Code court-like features just as Congress had the

ability under its authority to collect taxes and duties to adopt a summary procedure for the treasury to

collect a debt from one of its agents."  *Id.* at 343.  Historically, bankruptcy referees, lacking life tenure,

entered final orders reviewable only by appeal on disputes incident to the administration of property in

the actual or constructive possession of the court.  *Cf. Katchen v. Landy*, 382 U.S. 323, 329 (1966)

(affirming Congress's use of a summary process overseen by referees under the Bankruptcy Act of 1898

to allow, disallow, and reconsider claims against the bankruptcy estate).  Therefore, without Article III

status, a bankruptcy judge's authority to adjudicate a matter must stem either from Congress's power

under Article I to enact bankruptcy laws or from Congress's power under the "public rights" doctrine to

assign the matter to a non-Article III tribunal for final resolution without violating the due process clause

of the Fifth Amendment.

Writing for the *Stern* majority, Chief Justice John Roberts stated that the question presented in

*Stern* was a "narrow" one and that Congress had "in one isolated respect" exceeded the limitations

Article III of the Constitution places on who may exercise the judicial power of the United States.  *See id.*

at 2620.  Citing this language, some courts have declined to apply *Stern* to proceedings that do not

involve counterclaims brought by the bankruptcy estate against persons filing claims against the estate.

Still, other courts find *Stern*'s reasoning calls into question the authority of bankruptcy judges to decide

other core proceedings set forth in 28 U.S.C. § 157(b).  *See Burtch v. Seaport Capital, LLC (In re Direct*

*Response Media, Inc.)*, 466 B.R. 626, 639-44 (Bankr. D. Del. 2012) (discussing the "broad" and "narrow"

interpretations of *Stern* and citing cases).

Courts that interpret *Stern* narrowly argue that its holding removed only a debtor's state-law

counterclaim under § 157(b)(2)(C) from the final adjudicatory authority of the bankruptcy court.  *See,*

*e.g., Burtch*, 466 B.R. at 642-44; *In re USDigital, Inc.,* 461 B.R. 276, 292 (Bankr. D. Del. 2011); *In re Salander O'Reilly Galleries ("Salander")*, 453 B.R. 106, 115 (Bankr. S.D.N.Y. 2011). The "narrow interpretation" focuses on Justice Roberts' observation that the Court's decision would not "meaningfully change[] the division of labor" between the bankruptcy court and the district court. *Stern*, 131 S. Ct. 2620; *see, e.g., Salander*, 453 B.R. at 115-16 ("*Stern* is replete with language emphasizing that the ruling should be limited to the unique circumstances of that case, and the ruling does not remove from the bankruptcy court its jurisdiction over matters directly related to the estate that can be finally decided in connection with restructuring debtor and creditor relations."). Proponents of the narrow interpretation also argue that because Justice Scalia concurred in the judgment but disavowed its reasoning, *Stern*'s proposition that bankruptcy judges cannot decide core proceedings that seek to "augment the estate," such as fraudulent conveyance actions, received support from only four justices and, therefore, is not binding. *See Burtch*, 466 B.R. at 643.

However, a growing number of courts are interpreting *Stern* broadly, casting doubt on a bankruptcy court's authority to determine other core proceedings. *See generally Teleservices*, 456 B.R. 318. This "broad interpretation" focuses on the binary distinction set forth in *Granfinanciera* and reaffirmed in *Stern* between claims that seek to "augment the estate" and those that seek a "pro rata share of the bankruptcy res." *See Stern*, 131 S. Ct. at 2618; *Granfinanciera*, 492 U.S. at 56. This interpretation is considered "broad" because it expands *Stern*'s holding beyond state-law counterclaims. Indeed, courts have focused on the "augment" language to conclude that bankruptcy courts may not decide fraudulent conveyance actions brought by a trustee under 11 U.S.C. § 548. *See, e.g., In re Canopy Fin., Inc.*, 464 B.R. 770, 773 (Bankr. N.D. Ill. 2011); *Teleservices*, 456 B.R. at 338; *Sitka Enters., Inc. v. Wilfredo Segarra-Miranda*, 2011 WL 7168645, at *3 (D.P.R. Aug. 12, 2011).

The broad interpretation of *Stern* focuses on the Supreme Court's statement: "the question is whether the action at issue stems from the bankruptcy itself or would necessarily be resolved in the

claims allowance process." *See Stern*, 131 S. Ct. 2618.  Some courts call this the *Stern* "Two-Prong Test"

for bankruptcy judge authority.  *See, e.g., Burns v. Dennis (In re Southeastern Materials, Inc.)* 467 B.R.

337, 348 (Bankr. M.D.N.C. 2012).  If either prong of the test is met, then the bankruptcy court has

constitutional authority to enter a final order.  *See id.* at 348.  Conversely, if the action neither stems

from the bankruptcy itself nor would necessarily be resolved in the claims allowance process, the

bankruptcy court lacks constitutional authority to enter a final judgment and may only submit proposed

findings of fact and conclusions of law to the district court for entry of final judgment under 28 U.S.C. §

157(c)(1).[23]  *See id*.

### (iii)  Application of *Stern* in this Case

If the sheer volume of decisions spawned by *Stern* shows anything, it is that the debate over

whether to apply *Stern* narrowly or broadly is unsettled.  Pending clarification at the circuit level, each

bankruptcy judge must decide on a course of jurisprudence.  In this case, however, I need not adopt

either a "broad" or "narrow" interpretation of *Stern* because I would have constitutional authority to

decide the core proceedings at issue even under the broadest application of *Stern*.  *See* 131 S. Ct. at

2618.

An action to determine whether the Spendthrift Clause in the Family Trust excludes Ernest's

interest in that trust from property of the estate pursuant to 11 U.S.C. § 541(c)(2) "stems from the

bankruptcy itself."  *See id; In re Garcia*, 2012 WL 1021449, at *4 (Bankr. D. P.R. Mar. 26, 2012).  A

debtor's voluntary commencement of a bankruptcy case automatically creates an estate.  *See* 11 U.S.C.

§ 541(a).  Establishment of the estate is central to a bankruptcy's collective debt-collection scheme.  *See*

*In re Garcia*, 2012 WL 1021449, at *4.  The estate serves (1) as the receptacle of all property that is to be

subject to the proceeding and (2) as the vehicle through which that property is to be administered and

---

[23] The Defendants do not consent to my entering final judgment; therefore I need not determine whether a
bankruptcy judge could decide the proceedings at issue with the parties' consent pursuant to 28 U.S.C. § 157(c)(2).

then distributed. *Teleservices*, 456 B.R. at 332. The Code directs the bankruptcy trustee to "collect and reduce to money the property of the estate[.]" *See* 11 U.S.C. § 704(a)(1). The trustee may distribute this property pursuant to § 726(a) without order from any court. *See* 11 U.S.C. § 726(a); *Teleservices*, 456 B.R. at 333. Therefore, a controversy over whether a particular asset of the debtor is subject to the trustee's powers to collect and distribute under the Bankruptcy Code stems directly from the bankruptcy filing itself. *See Olivie Dev. Grp. LLC v. Park*, 2012 WL 1536207, *4 (W.D. Wash. Apr. 30, 2012) ("*Stern* did not hold that a bankruptcy judge lacks authority to enter judgment regarding what property is included in the estate."); *Southeastern*, 467 B.R. at 352-53 ("There can be no dispute that this [Bankruptcy] Court has the authority to determine what is and is not property of the Debtor's bankruptcy estate and enter final orders regarding the same.").

Moreover, the Trustee's action, if successful, will not "augment the bankruptcy estate," at least not in any way that invokes the *Stern* case. *See* 131 S. Ct. 2618. An action to determine whether an asset of the debtor is property of the estate does not give rise to the constitutional concern about the deprivation of property without due process of law implicit in *Stern*'s and *Northern Pipeline*'s discussions of actions that seek to "augment" the bankruptcy estate. *See* 458 U.S. at 56; 131 S. Ct. at 2601. Ernest's own right to due process is not at issue because he voluntarily submitted to the authority of the bankruptcy court when he filed his petition. *Cf. id.* at 333-34 (concluding that a sale of estate assets ordered pursuant to 11 U.S.C. §363(b) does not involve a "taking" of the debtor's property and noting, "[a]fter all, the debtor would have long ago acquiesced to the trustee's disposing of his property as part of his decision to file a voluntary petition."). If the Trustee successfully establishes that Ernest's interest the Family Trust is property of the estate, his action will not have augmented the estate with an asset belonging to a third party. Rather, it will merely have established that Ernest's interest in a trust is not excluded from the estate by § 541(c)(2). Such adjudication is similar to determining the amount of a debtor's exemption or a creditor's claim to property of the estate. *Cf. Langenkamp v. Culp*, 498 U.S. 42,

45 (1990) (holding that when respondents filed a claim against the bankruptcy estate, they brought

themselves within the equitable jurisdiction of the bankruptcy court to process said claim).

In sum, I conclude that an action under 11 U.S.C. § 541 to determine whether an interest of the

debtor is property of the estate stems from the bankruptcy, affects only the debtor's property interests,

and does not augment the estate.  Accordingly, a bankruptcy judge may decide the issue without

wielding the judicial power of the United States and can enter a final judgment.

**(b)  Whether the Defendants Are Entitled to Have a Jury Decide Whether Ernest's
Interest in the Family Trust is Property of the Estate**

A party's right to a jury trial in federal court is governed by federal law and therefore must

either arise from the Seventh Amendment to the Constitution or be granted by a federal statute.  *See*

*Nickless v. Distefano (In re Basile)*, 2012 WL 1987354, at *2 (Bankr. D. Mass. June 4, 2012).  In this case,

the Defendants assert a right to a jury trial based on the Seventh Amendment.

The Seventh Amendment provides: "In Suits at common law, where the value in controversy

shall exceed twenty dollars, the right of trial by jury shall be preserved[.]" U.S. CONST. amend. VII.  In

*Granfinanciera*, the Supreme Court interpreted the phrase "suits at common law" to refer to "suits in

which *legal* rights were to be ascertained and determined, in contradistinction to those where equitable

rights alone were recognized, and equitable remedies were administered."  *See* 492 U.S. at 41 *quoting*

*Parsons v. Beford*, 3 Pet. 433, 447 (1830).  *Granfinanciera* holds that the Seventh Amendment also

applies to actions brought to enforce statutory rights that are analogous to common-law causes of

action ordinarily decided in English law courts in the late 18th century.  *See id.* at 42.

The First Circuit has articulated a three-part test, based on the Supreme Court's analysis in

*Granfinanciera*, to determine whether the right to jury trial is present in a particular action.  *See*

*Braunstein v. McCabe ("Braunstein I")*, 571 F.3d 108, 118 (1st Cir. 2009).  First, the court must "compare

the statutory action to 18th-century actions brought in the courts of England prior to the merger of the

19

courts of law and equity." *See id. quoting Granfinanciera*, 492 U.S. at 42. Second, the court must

"examine the remedy sought and determine whether it is legal or equitable in nature." *Id.* This step is

more important that the first. *See Basile*, 2012 WL 1987354, at *3 ("Simply stated, claims which seek

legal remedies generally implicate the constitutional right to a jury trial while those sounding in equity

or admiralty do not."). Third, if the first two steps indicate a party has a jury trial right, the court "must

decide whether Congress may assign and has assigned resolution of the relevant claim to a non-Article

III adjudicative body that does not use a jury as factfinder." [24] *Id.*

Basile offers additional guidance on applying the *Granfinanciera* test to actions that involve both

legal and equitable claims:

> When an action involves a combination of both legal and equitable
> claims, "the right to jury trial on the legal claim, including all issues
> common to both claims, remains intact." *Curtis v. Loether*, 415 U.S. 189,
> 196 n.10, 94 S. Ct. 1005, 39 L.Ed.2d 260 (1974). Consequently, facts
> common to legal and equitable claims must be adjudicated by a jury.
> *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 510-11, 79 S. Ct. 948 []
> (1959). The right to a trial by jury must be preserved even if the legal
> claims are characterized as incidental to the equitable claims. *Dairy
> Queen, Inc. v. Wood*, 369 U.S. 469, 473 n.8, 82 S. Ct. 894, 897 n.8, 8
> L.Ed.2d 44 (1962). In such instances a court may not try the equitable
> claims first because to do so would subject the jury's findings to the
> principals of collateral estoppel. *Id.* at 479. Because protection of the
> right to trial by jury is so important, "only under the most imperative
> circumstances . . . can the right to a jury trial of legal issues be lost
> through prior determination of equitable claims." *Beacon Theatres*, 359
> U.S. at 510-11. *See also Abbott GmbH & Co., KG v. Centocor Ortho
> Biotech, Inc.*, 2012 WL 837313, at *13 (D. Mass. May 4, 2012).

*Id.*

---

[24] When the Supreme Court decided *Granfinanciera* in 1989, the current statutory provision for jury trials in bankruptcy proceedings was "notoriously ambiguous," and the Court proceeded as if there were no statutory predicate for the particular proceeding at issue. *See* 492 U.S. at 42 n.3. Congress has since enacted 28 U.S.C. § 157(e) authorizing bankruptcy judges to conduct jury trials with consent of the parties. This provision "answer[s] many of the questions the third prong of *Granfinanciera* addresses." *See Braunstein I*, 571 F.3d at 118 n.11. Because I find that the first two factors do not weigh in favor of a right to jury trial, I do not decide whether the third part of the *Granfinanciera* test survives. *See, e.g., Pereira v. Farace*, 413 F.3d 330, 357 (2d Cir. 2005) (applying *Granfinanciera* as a two-step test).

Count I of the Trustee's Complaint seeks a declaratory judgment that Ernest's interest in the

Family Trust is property of the estate under § 541(a) of the Bankruptcy Code and is not exempted by §

541(c)(2).  Following *Granfinancieara*, I must first determine whether this action sounded in common

law in England before the enactment of the Seventh Amendment, or whether there was an analogous

action at law.  *See Braunstein I*, 571 F.3d at 118.  Next, I must consider whether the request for

declaratory relief is legal or equitable in nature.

### (i)  Analogous Common-Law Causes of Action in 18th-century England

Bankruptcy law in England was the creation of Parliament, not the common law.  *See* Thomas E.

Plank, *Why Bankruptcy Judges Need Not and Should Not Be Article III Judges*, 72 Am. Bankr. L.J. 567, 575

(1998).  Initial adjudication of bankruptcy proceedings under the acts of Parliament was made by

bankruptcy commissioners appointed by the Lord Chancellor of England.  *See id.* at 574.  Issues

determined by the commissioners included the administration of the estate and the case, the eligibility

of the bankrupt, the property of the bankrupt, the allowance of claims by creditors, the distribution of

the bankrupt's assets, and the discharge of the bankrupt's debts.  *See id* at 576.  Aggrieved parties could

petition for review in the courts of law or Chancery.  *See id.* at 576-77.  Upon review, law courts

occasionally employed juries, but their function was the resolution of legal questions, not the

determination of facts.  *See id.* at 595.

In a general sense, 18th-century English bankruptcy was a creature of equity, and bankruptcy

commissioners, an arm of the Lord Chancellor.  *See id. quoting Comm. Of Unsecured Creditors of N.C.

Hosp. Ass'n Trust Fund v. Mem'l Mission Med. Ctr., Inc. (In re N.C. Hosp. Assin Trust Fund*), 112 B.R. 759,

762 (Bankr. E.D.N.C. 1990) ("In 18th-century England bankruptcy was essentially a creditor's remedy

involving the equitable distribution of the bankrupt's estate.").  In his *Commentaries*, William Blackstone

writes of bankruptcy as a proceeding in equity:

> By the several statutes relating to *bankrupts*, a summary jurisdiction is
> given to the chancellor, in many matters consequential or previous to
> the commissions thereby directed to be issued; from which the statutes
> give no appeal.

*1 William Blackstone & George Chase, The American Blackstone, Commentaries on the Laws of England in Books* 3d ed. 821 (1890).  The English bankruptcy acts of the 18th century expanded the powers of bankruptcy commissioners over property of the estate, including property conveyed before the act of bankruptcy.  *See* Plank, 72 Am. Bankr. L.J. at 584-86.

Modern courts agree that a bankruptcy trustee's gathering of the "property" of the estate, as both that property and the exclusions have been defined by Congress, is inherently an equitable task.  *See Braunstein I*, 571 F.3d at 119 (citing cases).  Moreover, proceedings involving trusts are inherently equitable.  *See Clews v. Jamieson*, 182 U.S. 461, 480 (1901) ("All possible trusts, whether express or implied, are within the jurisdiction of the chancellor."); *see also 2 William Blackstone, Commentaries §* 570 *440 ("The form of a *trust* . . . gives the courts of equity an exclusive jurisdiction as to the subject matter of all settlements and devises in that form."); *2 Joseph Story*, *Commentaries on Equity Jurisprudence as in England and America* 274 (1888) ("Trusts in real property  . . . are exclusively cognizable in equity.").  Modern bankruptcy courts agree.  *See Compton v. Walker (In re Coral Petroleum, Inc.)*, 249 B.R. 721, 733 (Bankr. S.D. Tex. 2000) ("[A] trust matter is within the equity jurisdiction of the court even if the relief sought is monetary recovery.").

In this case, resolution of the Trustee's request for declaratory relief on Count I turns on whether Ernest can exclude his beneficial interest in the Family Trust under 11 U.S.C. § 541(c)(2). Ernest's ability to exclude this interest turns on state law relating to trusts; whether under Massachusetts law a spendthrift clause in a self-settled trust is effective against creditors of the settlor-beneficiary.  Early Massachusetts court decisions make clear that a proceeding involving a trust has always sounded in equity.  *See Commissioner of Banks v. Harrigan*, 291 Mass. 353, 355 (1935) ("The preservation and enforcement of trusts, the ascertainment of violations of duty respecting the

management and execution of trusts, and the establishment of the extent of injury caused by infraction

of fiduciary obligations . . . constitute a familiar division of chancery jurisprudence."). Recent bankruptcy

court decisions applying *Granfinanciera* to proceedings involving trusts hold that jury trials are not

required by the Seventh Amendment. *See Coral Petroleum, Inc.*, 249 B.R. at 734 (holding that a jury trial

was not constitutionally required in an adversary proceeding brought by a successor trustee against the

former trustee of a chapter 11 liquidating trust for breach of fiduciary duty "because trusts are special

creatures over which courts of equity had virtually exclusive jurisdiction"). Accordingly, I find that the

first prong of the *Granfinanciera* test favors the Trustee because the Trustee's action for declaratory

relief that Ernest's interest in the Family Trust is property of the estate is analogous to 18th-century

actions heard in equity, or more likely before bankruptcy commissioners sitting without a jury.

### (ii)   The Nature of the Relief Sought

I also find that the greater-weighted second prong of the *Granfinanciera* test favors the Trustee.

In *Walker v. Weese*, the district court held that an action by a chapter 7 trustee to recover assets that

the debtors had fraudulently conveyed into a trust on the eve of bankruptcy sounded in equity and did

not entitle the debtors to a jury trial under the Seventh Amendment. *See* 286 B.R. 294, 298-99 (D. Md.

2002). There, the court relied on *Granfinanciera* itself for the proposition that fraudulent conveyance

actions to recover a definite sum of money were analogous to actions at law in 18th-century England.

*See id.* at 297. However, considering the second prong of the *Granfinanciera* test, the court noted that

the relief sought by the trustee was equitable in nature, and thus, no right to a jury trial existed. *See id.*

at 297-98. The court explained:

> [Debtors'] argument has a surface appeal because, as previously stated,
> the common law claim to which this cause of action is most analogous is
> a fraudulent conveyance claim. The [debtors] had the assets prior to
> the initiation of bankruptcy proceedings and divested themselves of the
> assets in an apparent attempt to place them beyond the reach of their
> creditors. [The trustee], however, is not attempting to prove the
> [debtors] committed fraud. At least in this lawsuit, [the trustee] is

actually alleging that the [debtors] *failed* in their attempt to fraudulently convey the assets. [The trustee's] request for declaratory relief does not rely upon the finding of a fraudulent conveyance.
. . .
Instead, [the trustee's] prayer for declaratory relief . . . depends upon whether an effective transfer of the funds ever took place. This will require . . . a determination as to whether a self-settled trust can be maintained in these circumstances under the applicable law. . . . If the Trust is self-settled and void under the applicable law, then the transfer would be ineffective and this action could be resolved with little need for a finder of fact. . . . The declaratory relief being sought in Count I is equitable in nature.

*Id.* at 298. Similarly, in this case, the Trustee seeks declaratory relief that Ernest's interest in Mandalay Drive is property of the estate, because the Family Trust is self-settled and, therefore, cannot be excluded under § 541(c)(2). The Trustee is arguing that the Family Trust, like the conveyance in *Walker*, fails to exclude Mandalay Drive from property of the estate.

I conclude that Trustee's action is historically analogous to actions at equity and that the nature of relief sought is equitable. Because the first two parts of the *Granfinanciera* test lead me to conclude there is no Seventh Amendment right to a jury trial, I do not reach the third part.

**2.   Determining the Extent of Ernest's Beneficial Interest in the Family Trust**

Count I of the Trustee's Complaint seeks a declaratory judgment that Ernest held a 100 percent beneficial interest in the Family Trust and that this interest is property of the Debtors' bankruptcy estate. Although determining whether the interest is property of the estate is a core proceeding for which I can enter a final judgment consistent with Article III of the Constitution, determining the *extent* of Ernest's interest on the petition date requires me to make findings of fact and conclusions of law based on events occurring pre-petition and, consequently, my authority to do so requires further analysis.

The Trustee's argument that Ernest held a 100 percent beneficial interest in the Family Trust on the day he and Michelle filed their bankruptcy petition is based on the First Amendment to the Family

Trust which purported to grant Ernest and his sister Danielle 75 and 25 percent interests respectively in

the Family Trust.  Under the terms of the First Amendment, Danielle would forfeit her interest—causing

it to inure to Ernest—if she ceased to use Mandalay Drive as her primary residence.  In his Complaint,

the Trustee has alleged that Danielle moved to Somerville, Massachusetts in 2006 and thereby forfeited

her interest in the Family Trust.

### (a)  Authority of the Bankruptcy Court to Enter a Final Judgment

### (i)   Statutory Authority under 28 U.S.C. § 157

A proceeding to determine whether Danielle forfeited her interest in the Family Trust is non-

core because it requires me to determine the extent of Ernest's pre-petition interest in the Family Trust.

*See Braunstein II*, 439 B.R. at 7 ("Non-core proceedings are state or federal claims that arise between

parties within a bankruptcy proceeding which could survive outside bankruptcy, and in the absence of

bankruptcy, would have been initiated in a state or district court.").  Since Danielle's actions forfeiting

her interest are alleged to have occurred pre-petition, Ernest's claim to 100 percent of the beneficial

interest in the Family Trust would have fully ripened pre-petition.  Moreover, Ernest's claim would arise

from the trust documents themselves, not the Bankruptcy Code.  It is a claim that can be brought at

state law, independent of a bankruptcy.  *See In re Boston Reg'l Med. Ctr., Inc.*, 265 B.R. 645, 650 (Bankr.

D. Mass. 2001) (holding that an action to determine the validity and extent of a debtor's pre-petition

interest in a trust was a non-core proceeding because it involved no rights arising under the Bankruptcy

Code and could be resolved exclusively through state law on estates and trusts); *see also Sheridan v.

Michels (In re Sheridan)*, 362 F.3d 96, 108-09 (1st Cir. 2004) (holding that an omnibus disciplinary

proceeding initiated against an attorney was not a core proceeding because most of the ethical

violations occurred in numerous bankruptcy cases previously closed, rather than in a pending

bankruptcy proceeding and, therefore, could not be said to have involved the sort of routine case

"administration" described in § 157(b)(2)(A)); *Braunstein II*, 439 B.R. at 8-10 (holding that a claim for

unjust enrichment arising out of a stipulation entered into post-petition in which numerous parties

reached an agreement to set-off claims was a core proceeding, but a claim for equitable subrogation

arising from the same underlying facts was ripe pre-petition, and thus, not a core proceeding).

The cases cited by the Trustee in support of core status are distinguishable. *In re Kincaid* was a

proceeding by a trustee in bankruptcy against the administrator of the debtor's deferred salary plan for

turnover of benefits to which the debtor was entitled. *See* 917 F.3d 1162 (9th Cir. 1990). The

administrator defended by asserting that the debtor's interest in the plan was excluded from her

bankruptcy estate by § 541(c)(2). Therefore, the proceeding boiled down to a § 541(c)(2) issue—

whether a particular interest of the debtor became property of the estate—which the Ninth Circuit

ruled was a core proceeding. *See id.* at 1168-69. *Kincaid* did not involve a dispute with a third party

about the existence or extent of the debtor's interest in the property as of the petition date, an issue

that the debtor could have brought outside of bankruptcy before the bankruptcy filing.

In *In re U.S. Lines, Inc.*, the Second Circuit affirmed the bankruptcy court's determination that an

action to establish a reorganization trust's rights under various pre-petition insurance contracts was a

core proceeding. *See* 197 F.3d 631, 634 (2d Cir. 1999). There, the Second Circuit noted that contract

claims are not core simply because they involve property of the estate. *See id.* at 637. However,

provisions in the insurance contracts required the debtor to pay the insurance claims first (when the

only source of payment would be assets earmarked for other creditors) before the insurance proceeds

would be made available to the debtor's personal injury claimants. *See id.* at 638. Under these unique

circumstances, the Second Circuit noted that a comprehensive declaratory judgment was required and,

therefore, determining the enforceability of the "pay-first" provisions in the insurance contracts was a

core proceeding because it directly affected the bankruptcy court's core administrative function of asset

allocation among creditors. *See id.* at 638-39. The present case contains none of the complex facts of

*U.S. Lines.* The Trustee is simply seeking a declaratory judgment as to the interest of Ernest in a trust on

26

the petition date.  Even if it is determined that Ernest's interest in the Family Trust is property of the

estate, determining the extent of that interest remains a non-core matter.  A dispute between the

trustee and the debtor as to whether, upon the bankruptcy filing, a particular asset of the debtor

became property of the estate is a core proceeding; but a dispute between the trustee and a third party

to determine whether (or to what extent) the debtor had an interest in that asset vis-à-vis the third

party as of the petition date is not a core proceeding.

Having determined that the proceeding is not core, and further noting that the Defendants have

not consented to my entering a final judgment in the proceeding pursuant to 28 U.S.C. § 157(c)(2), I shall

hear the proceeding and enter proposed findings of fact and conclusions of law on the extent of Ernest's

pre-petition interest in the Family Trust and, pursuant to § 157(c)(1), submit those findings and

conclusions to the district court for entry of a final judgment.

### (b)  Whether the Defendants Are Entitled to Have a Jury Decide the Extent of Ernest's Beneficial Interest in the Family Trust

As discussed in section III, A, 1, (b), (i) *supra*, a survey of Massachusetts case law makes clear

that a proceeding involving a trust has always sounded in equity.  *See Harrigan*, 291 Mass. at 355.  Trusts

are "special creatures over which courts of equity had virtually exclusive jurisdiction."  *Coral Petroleum,*

*Inc.*, 249 B.R. at 734.  Were Ernest to enforce his rights under the First Amendment to the Family Trust

at state law, he would likely bring suit in the Massachusetts probate court to determine the extent of his

and Danielle's relative interests in the Family Trust.  Moreover, the relief sought, a declaration of the

respective interests of Ernest and Danielle in a trust, would also be equitable in nature.  *Cf. In re Am.*

*Solar King*, 142 B.R. 772, 776 (W.D. Tex. 1992) (finding a right to a jury trial does not attach to an

equitable action for an accounting).  Accordingly, following *Granfinanciera*, I conclude the Defendants

have no Seventh Amendment right to a trial by jury with respect to Count I.

**B.  Reformation of the Deed that Conveyed Mandalay Drive from the 1981 Realty Trust to the
2001 Realty Trust to Correct a Scrivener's Error**

Both parties acknowledge a scrivener's error in the deed that transferred Mandalay Drive from

the 1981 Realty Trust to the 2001 Realty Trust.  The deed identifies Ernest Senior, the grantor for the

2001 Realty Trust as "Ernest O. Felice, as trustee of the Ernest O. Felice Family Trust."  It should have

referred to Ernest Senior as trustee of the 1981 Realty Trust, because, at the time the 2001 Realty Trust

and Family Trusts were established, Ernest Senior held Mandalay Drive in his capacity as trustee of the

1981 Realty Trust.  In Count II of his Complaint, the Trustee asks that this court reform the deed to

reflect the intention of Ernest Senior to transfer Mandalay Drive from the 1981 Realty Trust to the 2001

Realty Trust.

**1.  Authority of the Bankruptcy Court to Enter a Final Order Reforming the Deed**

The proceeding to reform the deed is non-core because it could be brought in state court,

independent of the bankruptcy proceeding, and was ripe for adjudication pre-petition.  *See Sheridan*,

362 F.3d at 109; *Braunstein II*, 439 B.R. at 9-10.[25]  Consequently, I may enter a final order reforming the

deed only with the parties' consent.  *See* 28 U.S.C. § 157(c)(2).  As the Defendants do not consent, I shall

hear the proceeding and submit proposed findings of fact and conclusions of law to the district court for

entry of a final order.  *See* 28 U.S.C. § 157(c)(1).

---

[25] The Trustee argues that reforming the deed in this case is a core proceeding because it is "intertwined with the
relief sought in Count I."  *See Chapter 7 Trustee's Memorandum of Law Regarding Jurisdiction and Defendants'
Demand for Jury Trial*, 4.  In support of this, the Trustee cites to *U.S. Lines* for the proposition that a proceeding
may be core if it directly affects a core bankruptcy function.  *See* 197 F.3d at 637.  However, for the reasons
discussed in section III, A, 2, (a), (i) *supra*, I decline to extend the *U.S. Lines* holding to the facts of this case.
Congress has defined those proceedings that affect core bankruptcy functions as proceedings "otherwise related
to" the bankruptcy (i.e., "non-core" proceedings), *see* 28 U.S.C. § 157(b), and has explicitly directed that the district
court enter final order or judgment in those proceedings, unless the parties consent to entry of judgment by the
bankruptcy judge.  *See* 28 U.S.C. § 157(c)(1).

**2.  Whether the Defendants Are Entitled to Have a Jury Decide Whether to Reform the Deed**

On the record before me, both parties seem to agree that the deed transferring Mandalay Drive from the 1981 Realty Trust to the 2001 Realty Trust contained a scrivener's error and the true intent of Ernest Senior was to transfer Mandalay Drive into the 2001 Realty Trust.[26]  Therefore, I note that I cannot perceive any issue of material fact for a jury to decide.  Nevertheless, the Defendants have made a general claim for a jury trial.  Unfortunately, their pithy Statement in Compliance with my Pre-Trial Order, in which I required the parties to state "with respect to each count in the complaint, whether the right to a jury trial applies to that count, with a brief citation to authority," fails to respond to each count and simply foists upon the Court the lazy assertion that "they are entitled to a jury trial, pursuant to *Granfinanciera SA v Nordberg*."  And so I must undertake the *Granfinanciera* analysis with respect to Count II of the Trustee's Complaint.

The Trustee requests that a court reform the deed.  This is not a cause of action, but rather, a remedy.  This remedy would likely follow an action to quiet title because the Trustee seeks to establish that the 2001 Realty Trust holds legal title to Mandalay Drive.  Under the first prong of the *Granfinanciera* test, an action to quiet title would, in 18th-century England, have been brought in the courts of equity.  "An action for quiet title . . . has been administered by the courts of equity, not the law courts, since the time of the adoption of the United States Constitution."  *Case v. Grabicki (In re Bays)*, 2010 WL 3190578, at *4 (Bankr. E.D. Wash. Aug. 11, 2010), *citing to Pomery's Equity Jurisprudence and Equitable Remedies*, § 2158 4th ed. (1919); *see also United States v. Porath*, 764 F. Supp. 2d 883, 890-92 (E.D. Mich. 2011) (finding no Seventh Amendment right to a jury trial and stating: "the defendants seek

---

[26] In their Answer to the Trustee's Complaint, the Defendants deny all allegations relating to the deed.  *See Answer of Defendants and Jury Trial Claim*, 5 ¶¶ 30-33.  Later however, in their *Memorandum in Support of Defendant, Ernest J. Felice's Motion for Determination That The Debtor's Beneficial Interest In Various Trust Documents is not An (sic) Property of the Estate, Due To The Spendthrift Clause Contained Therein*, p. 2-3, ¶ 3, the Defendants acknowledge: "That deed should have been from 'Ernest O Felice, trustee of Felice Realty Trust,' and was a typographical error."

to quiet title in real property.  It is beyond dispute that these actions have their historical origins in

courts of equity.").

Under the second prong of *Granfinanciera*, the nature of the relief sought—reformation of the

deed—is unquestionably an equitable remedy.  *See Walden v. Skinner*, 101 U.S. 577, 584 (1880)

("Equitable rules of the kind are applicable to sealed instruments, as well as to ordinary written

agreements, the rule being that if by mistake a deed be drawn plainly different from the agreement of

the parties, a court of equity will grant relief by considering the deed as if it had conformed to the

antecedent agreement."); *Lhu v. Dignoti*, 431 Mass. 292, 296 (2000) (referring to an action to reform a

deed based on mutual mistake as an "equitable remedy").  Accordingly, following *Granfinanciera*, I

conclude the Defendants have no Seventh Amendment right to a trial by jury with respect to Count II.


**C.  Avoidance of the Unauthorized Post-Petition Transfer of the Beneficial Interest in the Family Trust**

By Count III and VII of his Complaint, the Trustee seeks to avoid, recover, and preserve for the

benefit of the estate the unauthorized transfer of a portion of Ernest's interest in the Family Trust to his

sister, Danielle, which Ernest and Danielle accomplished by executing the Second Amendment to the

Family Trust on January 28, 2008, two months after the Debtors had filed their bankruptcy petition.

Section 549(a) of the Bankruptcy Code allows the trustee to avoid a transfer of property of the estate

that is not authorized by the Code or the court.  If the Trustee is successful in establishing that Ernest's

beneficial interest in the Family Trust is property of the estate, he will be able to pursue an avoidance

action under two scenarios.  If the Trustee is successful in establishing that Danielle, under the terms of

the First Amendment to the Family Trust, forfeited her 25 percent share, thereby bringing Ernest's share

to 100 percent, he will seek to avoid the post-petition transfer of a 50 percent share to Danielle.

Alternatively, if he cannot establish Danielle's forfeiture of her 25 percent share, the Trustee will still

seek to recover the additional 25 percent granted to Danielle through the Second Amendment to the

Family Trust (recall that under the terms of the First Amendment, Ernest and Danielle's shares were

divided 75/25).  Under either scenario, the Second Amendment to the Family Trust has resulted in the

transfer of an interest belonging to Ernest on the petition date, which, if property of the estate, the

Trustee may seek to avoid pursuant to 11 U.S.C. § 549.

    **1.**   **Authority of the Bankruptcy Court to Enter a Final Order in a Proceeding to Avoid a
Post-Petition Transfer Pursuant to 11 U.S.C. § 549**

      **(a)**   **Statutory Authority Under 28 U.S.C. § 157(b)**

Although the avoidance of a post-petition transfer of property of the estate brought under 11

U.S.C. § 549 is not listed as one of the enumerated core proceedings in 28 U.S.C. § 157(b)(2), the

prevailing conclusion is that such an action falls within the bankruptcy court's "arising under title 11"

jurisdiction and therefore may be considered core. *See Braunstein v. Branch Group, Inc. (In re

Massachusetts Gas & Elec. Light Supply Co., Inc.)*, 200 B.R. 471, 472 (Bankr. D. Mass. 1996); *N. Parent.

Inc. v. Cotter & Company, (In re N. Parent, Inc.)*, 221 B.R. 609, 629 (Bankr. D. Mass. 1998) ("This cause of

action 'arises under title 11['], could not exist but in bankruptcy, and is intended to remedy improper

administration of the case and the estate."); *Searcy v. Knight (In re American Int'l Refinery)*, 2012 WL

293005, at *1 (Bankr. W.D. La. Jan. 31, 2012) (holding that a § 549 claim falls within the bankruptcy

court's "arising under" jurisdiction); *see also 1 Collier on Bankruptcy* ¶ 3.02[3][b] (Alan N. Resnick &

Henry J. Sommer eds, 16th ed.) ("While other avoidance actions, such as those arising under sections

544, 545 and 549, are not included in the list of section 157(b)(2), these, too, are core proceedings.").

An avoidance action arising under § 549 is a special creature of the Bankruptcy Code that could not exist

outside of a bankruptcy proceeding.  Unlike actions to avoid fraudulent conveyances arising under §§

544 and 548 of the Code, the avoidance of a post-petition transfer under § 549 neither depends on a

state law cause of action nor involves any of the elements of a common law fraudulent conveyance. *See

Springel v. Prosser (In re Innovative Communication Corp.)*, 2011 WL 3439291, at *3 (Bankr. D.V.I. Aug. 5,

2011) (contrasting avoidance actions brought under § 549 with those brought under §§ 544 and 548).

Therefore, I conclude that I have statutory authority under 28 U.S.C. § 157(b)(2) to decide the Trustee's

avoidance claim.

In addition to avoiding the post-petition transfer, Count VII of the Trustee's Complaint seeks to

recover from Danielle, pursuant to 11 U.S.C. § 550, the property transferred.  Section 550(a)(1) of the

Bankruptcy Code gives the trustee a right to recover property—or, if the court so orders, the value of

such property—to the extent avoided "from the initial transferee of such transfer."   Moreover, under §

551 of the Bankruptcy Code, any transfer avoided under § 549 would automatically be preserved for the

benefit of the estate.  11 U.S.C. § 551 ("Any transfer avoided under section . . . 549 . . . of this title . . . is

preserved for the benefit of the estate, but only with respect to property of the estate.")  In this case,

the Second Amendment to the Family Trust gave Danielle a 50 percent beneficial interest in the Family

Trust.  To the extent that this 50 percent share was property of the bankruptcy estate on the petition

date, it may be recovered from Danielle and preserved for the benefit of the estate.  *See* 11 U.S.C. §§

549, 550, and 551.

As I explained in *Miller v. Grosso (In re Miller)*, rights arising under §§ 550 and 551 are derivative

of rights of recovery stemming from an unauthorized post-petition transfer and should therefore be

construed as simply part of the Trustee's action to avoid the post-petition transfer pled in Count III.  *See*

467 B.R. 677, 680 (Bankr. D. Mass. 2012).  Count VII therefore requires no separate determination of its

core status.  Accordingly, Counts III and VII of the Complaint are statutory core proceedings in which I

may enter a final order or judgment.

### (b)  Constitutional Authority Under Article III

An action pursuant to 11 U.S.C. § 549 to recover an unauthorized post-petition transfer of

property of the estate "stems from the bankruptcy itself."  *See Stern*, 131 S. Ct. at 2618; *In re Innovative

Commc'n. Corp.*, 2011 WL 3439291, at *3 ("An action to avoid and recover unauthorized postpetition

transfers pursuant to 11 U.S.C. § 549 is purely a creation of the Bankruptcy Code and does not otherwise

exist outside of Title 11.").  Congress enacted § 549 to ensure the equal distribution of the bankruptcy

res among creditors by giving the trustee or debtor in possession a remedy for recovery of unauthorized

transfers of property of the estate.  The role of § 549 in protecting the bankruptcy estate was explained

by the bankruptcy court in *In re Ford*:

> The filing of a bankruptcy case thus vests *exclusive* jurisdiction over the
> debtor's property in the bankruptcy court so that the bankruptcy court
> can control its administration.  With regard to property, the bankruptcy
> case is *in rem*; the property of the debtor and of the estate is *in custodia
> legis*.  Such property cannot be removed from the bankruptcy court's
> exclusive jurisdiction except by appropriate proceedings in the
> bankruptcy court.  Section 362(a) prohibits *involuntary* removal of
> assets unless permitted by lifting of the stay while other sections (such
> as § 363 and § 554) provide for the *voluntary* disposition of assets
> during administration of the case if *authorized*.  Section 549(a) provides
> a remedy for the avoidance of *voluntary* transfers that are
> *unauthorized*[.]

296 B.R. 537, 548 (Bankr. N.D. Ga. 2003).

Unlike the counterclaim in *Stern*, the recovery of an unauthorized post-petition transfer will not

"augment the estate."  *See* 131 S. Ct. at 2018.  Because the property recovered through a § 549 action

was already estate property prior to the transfer, all § 549 seeks to do is restore property of the estate

to the control of the bankruptcy court for proper administration.  In this respect § 549 actions differ

from actions to recover fraudulent conveyances, which, by definition, do not involve assets that were

property of the estate on the petition date.  *Contrast* 11 U.S.C. § 549(a) (allowing the trustee to avoid "a

transfer of property of the estate") *with* §§ 544(b) and 548(a) (allowing the trustee to avoid a transfer of

"an interest of the debtor in property").  The bankruptcy court for the Southern District of Texas

reasoned along these same lines in *West v. Freedom Medical, Inc. (In re Apex Long Term Acute Care—

Katy, L.P.)*, when reviewing an action to recover a preference brought under 11 U.S.C. § 547.  *See* 465

B.R. 452, 463 (Bankr. S.D. Tex. 2011).  In concluding that a bankruptcy judge's authority to decide a §

547 action is consistent with Article III of the Constitution, the court held that property recovered

through a § 547 action was always property of the estate, and concluded:

> [t]he situation is closely analogous to the recovery of a post-petition
> transfer under § 549.  Section 549 restores to the estate the *res* as it
> existed on the petition date; § 547 restores the *res* as it existed 90 days
> before the petition date.  There is no serious question that a § 549
> cause of action is within the bankruptcy court's *in rem* authority.

*Id.* at 464.  Accordingly, because the count to recover an unauthorized post-petition transfer stems from

the Bankruptcy Code and does not seek to augment the estate, I may enter a final order or judgment as

to Count III of the Trustee's Complaint without running afoul of Article III of the Constitution.

I may also effectuate the recovery permitted by § 549 by issuing orders pursuant to §§ 550 and

551.  The property to be recovered is already property of the estate, and "the jurisdiction of courts

adjudicating rights in the bankrupt estate include[s] the power to issue compulsory orders to facilitate

the administration and distribution of the res."  *Central Virginia Community College v. Katz*, 546 U.S.

356, 362 (2006).  The Supreme Court explained in *Katz*:

> In some cases, though, the trustee, in order to marshal the entirety of
> the debtor's estate, will need to recover the subject of the transfer
> pursuant to § 550(a).  A court order mandating turnover of the
> property, although ancillary to and in furtherance of the court's *in rem*
> jurisdiction, might itself involve *in personam* process. . . . it is not
> necessary to decide whether actions to recover preferential transfers
> pursuant to § 550(a) are themselves properly characterized as *in rem*.
> Whatever the appropriate appellation, those who crafted the
> Bankruptcy Clause would have understood it to give Congress the
> power to authorize courts to avoid preferential transfers and to recover
> the transferred property.  Petitioners do not dispute that that authority
> has been a core aspect of the administration of bankrupt estates since
> at least the 18th century.

*Id.* at 371-72.  As an order pursuant to § 550(a) is derivative of whatever right of recovery the court is

adjudicating, and as bankruptcy judges may adjudicate recovery actions brought under § 549, I am

satisfied that any order I enter requiring Danielle to return the property transferred, or the value

thereof, to the estate will be consistent with Article III and with the due process it affords.

**2.   Whether the Defendants Are Entitled to Have a Jury Decide the § 549 Recovery Claim**

To determine whether Danielle is entitled to a jury trial under the Seventh Amendment in the

Trustee's action against her, I must again apply *Granfinanciera*.  However, because the *Granfinanciera*

test bifurcates the claim at issue into action and remedy, it makes sense to consider Counts III and VII of

the Trustee's Complaint together.  Count III seeks to avoid Ernest's unauthorized post-petition transfer

to Danielle of a portion of his beneficial interest in the Family Trust.  Count VII seeks to recover from

Danielle that interest in the Family Trust for the benefit of the bankruptcy estate.  Count VII is essentially

the remedy stemming from the action pursued in Count III.  Together, these Counts constitute one "§

549 Recovery Claim."  The "action" part is avoidance pursuant to § 549; the "remedy" part is recovery

pursuant to § 550(a).[27]

The Tenth Circuit has held, in the wake of *Granfinanciera*, that the Seventh Amendment right to

a jury trial does not attach to an action to recover an unauthorized post-petition transfer brought under

11 U.S.C. § 549.  *See Jobin v. Youth Benefits Unlimited, Inc. (In re M&L Bus. Machine Co.)*, 59 F.3d 1078,

1082 (10th Cir. 1995).  The Tenth Circuit stated:

> We conclude that enforcement of Section 549, a provision clearly
> designed to protect the bankruptcy estate following its inception, is a
> procedure which is equitable in nature.  Moreover, through the
> Bankruptcy Act Congress has established that the Bankruptcy Court is
> the tribunal in which the protection of that estate is accomplished, and
> in which disputes may be resolved by way of summary proceedings.
> There is no underlying legal claim in this case, such as one to recover an
> alleged fraudulent conveyance, which warrants a contrary result.  We
> thus agree with the Colorado District Court in its ruling prior to trial [in]

---

[27] It makes sense to consider Counts III and VII as one § 549 Recovery Claim for the purpose of the *Granfinanciera*
analysis because Chapter 5 of the Bankruptcy Code sets avoidance actions apart from their remedies.  Sections
544, 547, 548, and 549 go hand-in-hand with the recovery and preservation sections 550 and 551.  As the
bankruptcy court explained in *Official Comm. of Unsecured Creditors v. Foss (In re Felt Mfg. Co., Inc.)*:

> Section 550(a) defines the party *from whom* a trustee, or the Committee in this case, may seek to
> recover the property preferentially or fraudulently transferred or the value or proceeds of such
> property.  It enunciates the separation between the concepts of avoiding a transfer and
> recovering from the transferee.

371 B.R. 589, 635 (Bankr. D.N.H. 2007) (internal quotation and citations omitted).

the Bankruptcy Court that there is no right to trial by jury in a trustee's
Section 549 claim for recovery of a post-petition transfer.

*Id.* (internal citations omitted).  The First Circuit cited favorably to *M&L Bus. Machine Co.* in *Braunstein I*,

concluding there is no Seventh Amendment right to a jury trial in a turnover action brought pursuant to

11 U.S.C. § 542, and commenting:

> [O]ur conclusion that there is no jury trial in a turnover action under §
> 542 is supported by analogy to court decisions under § 549 of the
> Bankruptcy Code, under which a trustee may avoid certain post-petition
> transfers.  Courts have held that § 549 actions are equitable rather than
> legal and do not include a jury trial right.

571 F.3d at 123.

I agree with the reasoning of the Tenth Circuit.  Actions to recover unauthorized post-petition

transfers are brought for the purpose of preserving the bankruptcy res for equitable distribution among

creditors and are therefore analogous to 18th century actions brought in the courts of equity to

administer bankruptcy estates.  *See M&L Bus. Machine Co.*, 59 F.3d at 1082; *see also Committee of*

*Unsecured Creditors of N. C. Hosp. Ass'n Trust Fund v. Mem'l Mission Med. Ctr., Inc. (In re N. Carolina*

*Hosp. Ass'n Trust Fund, Employer ID#: 56-1154690)*, 112 B.R. 759, 762-63 (Bankr. E.D.N.C. 1990)

(concluding that even if § 549 actions have some characteristics of actions at law, they arise out of a

"public right" because they protect the bankruptcy estate after it comes into existence and, therefore,

no Seventh Amendment right to a jury trial arises).  Moreover, the remedy sought in this action,

recovery of the interest or value thereof pursuant to 11 U.S.C. § 550(a), is inherently equitable in nature

as it seeks to restore the status quo as of the date of the bankruptcy filing.  *Cf. Tull v. U.S.*, 481 U.S. 412,

423-24 (1987) (distinguishing between remedies to enforce civil penalties intended to punish the

defendant and those, such as restitution or disgorgement of improper profits, that are limited to

"restoring the status quo," and finding a right to jury trial in the former but not the latter).  Accordingly,

the Defendants are not entitled to a jury trial as to Counts III and VII of the Trustee's Complaint.  *See*

*Kan. Express Int'l, Inc. v. Hassan (In re Hassan)*, 376 B.R. 1, 14 (Bankr. D. Kan. 2007) (following *M&L*

*Machine Co.* and concluding the defendants had no right to a jury trial on claims brought under sections

549 and 550 of the Bankruptcy Code).

### 3.    The Defendants' Reliance on *Whitehead v. Shattuck*

Before addressing the final two Counts of the Trustee's Complaint it is necessary to address the

only argument the Defendants submitted regarding their right to a jury trial under the Seventh

Amendment.  Rather than address each count separately, the Defendants characterize the entire

Complaint as a proceeding to recover and possess specific real property.  They argue:

> Ever since *Whitehead v. Shattuck*, 138 U.S. 146, 151 (1891), the
> Supreme Court has viewed actions for the recovery and possession of
> specific real property as actions at law. . . . The Supreme Court in
> *Granfinanciera* cited with approval its holding in Whitehead, stating that
> actions for the recovery of fraudulently conveyed real property, like
> actions for money damages, are actions at law triable to a jury.

*Memorandum of Defendants Regarding Jurisdiction Issues (Jury Trial Claim)* at 3-4.

In *Whitehead*, the plaintiff brought a suit in equity to quiet title in certain real property.  In

affirming the district court's dismissal of the action, the Supreme Court stated:

> [W]henever a court of law is competent to take cognizance of a right,
> and has power to proceed to a judgment which affords a plain,
> adequate, and complete remedy, without aid of a court of equity, the
> plaintiff must proceed at law, because the defendant has a
> constitutional right to a trial by jury.

138 U.S. at 151.  The Court noted that the plaintiff did, in fact, have a complete remedy at law:  he could

bring an action for ejectment against the unlawful occupants of his land.  *See id.* at 146.  The Court then

stated the proposition upon which the Defendants rely: "where an action is simply for the recovery and

possession of specific, real, or personal property, or for the recovery of a money judgment, the action is

one at law." *Id.* at 151.  The Supreme Court has since affirmed this proposition in *Pernell v. Southall Realty*.  *See* 416 U.S. 363, 370 (1974).[28]

Both *Whitehead* and *Pernell* can be distinguished from the present case.  The plaintiff in *Whitehead* could avail himself of a remedy at law, ejectment.  *See* 138 U.S. at 151.  Similarly, the statute under review in *Pernell* was District of Columbia Code 16-1501, which established a summary process to evict a person detaining possession of real property without right, a procedure the Court decided was analogous to common law ejectment.  *See* 416 U.S. at 369, 375.  In the present adversary proceeding, the Defendants have not argued that the Trustee has a remedy at law, and I am not aware of any.

First, this proceeding is not about ejectment.  The Trustee does not seek ejectment.  No one even alleges that Danielle lives at Mandalay Drive; and an action for ejectment "would not lie where there is no occupant."  *See Whitehead*, 138 U.S. at 155 (discussing the Supreme Court's earlier decision in *Holland v. Challen*, 110 U.S. 15 (1884)).

Second, and more importantly, for the various reasons stated elsewhere in this memorandum, each of the counts that the Trustee has pled sounds in equity.  None are an end run around an obvious remedy at law.  Certainly the Defendants cite no remedy at law that might obviate any one of the Trustee's counts.  Rather, the Defendants characterize the Complaint as one to recover real property, and they suggest that there are remedies at law to accomplish that.  This argument mischaracterizes the subject-matter of the Complaint, which is not to recover real property but to recover, and determine the extent of the estate's interest in, a beneficial interest in a trust.  To be sure, if he is successful, the Trustee will likely seek to liquidate the Ernest's beneficial interest for the estate, and this in turn may

---

[28] *Granfinanciera* also quotes *Whitehead* for the proposition that an action for the recovery and possession of specific real property is one at law.  *See* 492 U.S. at 46 n. 5.  However, the Court avoided deciding whether the Seventh Amendment guaranteed a right to jury trial in actions to *avoid fraudulent conveyances* of real property, repeatedly characterizing the action at issue in *Granfinanciera* as one for a "determinate sum of money."  *See id.* at 45 ("Although [an 18th century English case for the recovery of receivables] demonstrates that fraudulent conveyance actions could be brought in equity, it does not show that suits to recover a definite sum of money would be decided by a court of equity when a petitioner did not seek distinctively equitable remedies.").

involve the liquidation of Mandalay Drive (though it is not his only option), but the present proceeding

would do nothing more than establish (i) the extent of Ernest's beneficial interest in the Family Trust

and (ii) that such interest is the estate's.  It is fundamentally about rights in trusts, reformation of a

deed, and §§ 541(c)(2) and 549 of the Bankruptcy Code, all equitable.  The Defendants' overly simplistic

reliance on *Whitehead* ignores the plethora of equitable remedies the Trustee needs and has requested.

*See Resolution Trust Co. v. Pasquariello (In re Pasquariello)*, 16 F.3d 525, 531 (3rd Cir. 1994) ("Due to the

mixed bag of remedies sought, it is not clear that the district court erred in concluding that complete

relief is not available at law.").  In *Whitehead*, the Court noted that whenever a court of law can offer a

complete remedy, the plaintiff must proceed at law.  *See* 138 U.S. at 151.  Here, before the Trustee can

avoid the post-petition transfer, he must establish that Ernest's interest in the Family Trust is property

of the estate, determine the extent of that interest on the petition date, and reform the deed conveying

Mandalay Drive into the 2001 Realty Trust.  All require equitable remedies.  Accordingly, I conclude that

the Defendants' reliance on *Whitehead* is misplaced as applied to the facts of this case and the nature of

the relief sought by the Trustee.  The Defendants have no right to a jury trial in this proceeding.

### D.  Declaration Concerning the Debtors' Rights to Exempt Mandalay Drive

In Count VIII of the Complaint, the Trustee seeks a declaration that the Debtors have no rights of

exemption for Ernest's interest, through the Family Trust, in Mandalay Drive.  The Debtors filed their

original schedules on November 28, 2007, and listed no real property on Schedule A, their schedule of

real property.  On January 28, 2008, Ernest executed the Second Amendment to the Family Trust, which

transferred some beneficial interest in the Family Trust to Danielle.  On May 3, 2010, the Debtors moved

to amend their Schedule A, listing an interest in Mandalay Drive "for information purposes only."  They

also amended Schedule C, their schedule of exemptions, to exempt Ernest's interest in Mandalay Drive

to the extent of $21,625 under 11 U.S.C. § 522(d)(1) in the event it is determined that Mandalay Drive is

property of the estate.  The Trustee alleges that the Debtors concealed Ernest's interest in Mandalay

Drive and that Ernest transferred part of that interest to Danielle post-petition.  Section 522(g) of the

Bankruptcy Code allows a debtor to exempt property the trustee recovers under § 550 but only if the

avoided transfer was involuntary and the debtor did not conceal such property.  The Trustee argues that

the Debtors are not allowed to exempt any portion of their interest in Mandalay Drive because the post-

petition transfer was concealed and voluntary.

### 1.   Authority of the Bankruptcy Court to Enter a Declaration on the Exemption

#### (a)  Statutory Authority Under 28 U.S.C. § 157

Count VIII is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(B).  Exemption

allowance disputes are core bankruptcy proceedings.  *See Wal-Mart Stores, Inc. v. Carpenter (In re*

*Carpenter)*, 245 B.R. 39, 43 (Bankr. E.D. Va. 2000) *aff'd* 252 B.R. 905 (E.D. Va. 2000) *aff'd* Fed. Appx. 80

(4th Cir. 2002).

#### (b)  Constitutional Authority

 The authority conferred upon a bankruptcy judge by § 157(b)(2)(B) to decide this count is

consistent with Article III of the Constitution.  First, although the allowance or disallowance of an

exemption will affect the return to creditors, it does not "augment" the bankruptcy estate in the sense

intended by the Supreme Court in *Stern*, where a favorable adjudication of Vickie's counterclaim would

have taken property from Pierce for the benefit of the estate.  *See* 131 S. Ct. at 2618 (finding no reason

to treat Vickie's counterclaim differently from the fraudulent conveyance action in *Granfinanciera*,

which augmented the bankruptcy estate).[29]  Second, the right to exempt property from the bankruptcy

estate stems directly from § 522(b) of the Bankruptcy Code.  *See In re Carlew*, 469 B.R. 666, 673 (Bankr.

S.D. Tex. 2012) (holding that exemption determinations are inextricably tied to the bankruptcy scheme

---

[29] The bankruptcy estate is defined by 11 U.S.C. § 541.  Section 522(b) allows a debtor to exclude property of the estate from distribution to creditors up to a certain value by affirmatively electing state or federal exemptions.  All exemptible property is, until its exemption, property of the estate.  In contrast, property listed in § 541(b) and in § 541(c)(2) is not property of the estate and will not be included in the bankruptcy res regardless of whether the debtor claims it as exempt.

and involve the adjudication of rights created by the Bankruptcy Code); *accord In re Hill*, 2011 WL

6936357 (Bankr. S.D. Tex. Dec. 30, 2011); *In re Okwonna-Felix*, 2011 WL 3421561 (Bankr. S.D. Tex. Aug.

3, 2011).

Finally, by voluntarily filing for bankruptcy relief, the Debtors willingly subjected themselves to a

federal scheme for restructuring debtor-creditor relations created by Congress pursuant to its Article I

power to "establish . . . uniform Laws on the subject of Bankruptcies,"  U.S. Const. Art. I, § 8, cl. 4.  A

core feature of that scheme is the debtor's consent to the trustee's disposing of his property.  *See*

*Teleservices*, 456 B.R. at 333.  The administration of the estate was a matter historically handled by

bankruptcy commissioners without life tenure, subject to appeal in the courts of equity.  *See* Plank, 72

Am. Bankr. L.J. at 578-589 (discussing duties of bankruptcy commissioners under 18th century English

bankruptcy law).  For these reasons, the due process issues inherent in *Stern* and *Northern Pipeline*

concerning the taking of property without Article III adjudication do not arise.  *Cf. N.I.S. Corp. v. Hallahan*

*(In re Hallahan)*, 936 F.2d 1496, 1505 (7th Cir. 1991) (holding that a debtor who voluntarily files

bankruptcy has waived his Seventh Amendment right to a jury trial because he can have no stronger

rights than his creditors, who, by filing proofs of claim in the debtor's bankruptcy, lose the right to a jury

trial on any matters necessarily resolved in the claims allowance process).  Accordingly, I may enter a

final order as to Count VIII of the Complaint.

### 2.   Whether the Debtors Have a Right to a Trial by Jury

I find only one previous case relating to jury trial rights in proceedings relating to bankruptcy

exemptions.  In *Herrans v. Mender*, the District of Puerto Rico adopted a magistrate judge's report and

recommendation affirming the decision of the bankruptcy court and, without discussing *Granfinanciera*,

stated:

> In this case, the core issue is the extent of an exemption claimed by
> Debtors over an asset of the estate and the authority of the Trustee to
> administer it.  This issue concerns a core proceeding equitable in nature

> because it relates directly to the administration of the estate.  After
> reviewing prior precedent, this Court agrees with the majority of
> decisions and concludes that there is a (sic) no right to trial by jury in
> bankruptcy core proceedings.

364 B.R. 463, 473 (D. P.R. 2007).  The assertion that there is no right to a trial by jury in core proceedings

is in direct conflict with *Granfinanciera*, which held the Seventh Amendment applied in a proceeding to

avoid the fraudulent conveyance of a definite sum of money—a statutorily core proceeding under 28

U.S.C. § 157(b)(2)(H).  *See* 492 U.S. at 61 (noting that codification of a common law fraudulent

conveyance action was a "purely taxonomic change" that could not eliminate a party's Seventh

Amendment right to a jury trial).

The rationale in *Herrans* aside, its conclusion that there is no right to a jury trial on objections to

claims of exemption is valid.  That conclusion is supported by the First Circuit's decision in *Braunstein I*.

There, after conducting a thorough analysis under both prongs of *Granfinanciera*, the First Circuit held

that a debtor has no right to a jury trial in a turnover action brought by the trustee pursuant to 11 U.S.C.

§ 542.  *Braunstein I*, 571 F.3d at 119.  Notably, the First Circuit stated, "the trustee's gathering of the

'property' *of the estate*, as both that property and the exclusions have been defined by Congress, is

inherently an equitable task."  *Id*.  Like a § 542 turnover action, a proceeding relating to a debtor's

exemption rights is equitable in nature because it concerns property of the estate.  Just as a proceeding

to determine a creditor's pro rata share in the bankruptcy res affects the equitable distribution of the

estate among creditors, *see Granfinanciera*, 492 U.S. at 57, a proceeding to adjudicate a debtor's

exemption rights affects the equitable distribution of the estate between creditors and the debtor.

Furthermore, *Granfinanciera* itself supports the conclusion that there is no jury right.  There, the

Supreme Court affirmed its decision in *Katchen v. Landy*, 382 U.S. 323 (1966), which allowed a

bankruptcy court to rule on a trustee's preference action against a creditor who had filed a proof of

claim against the estate without allowing the creditor a jury trial.  *See id.*  The Court noted that *Katchen*

turned on the bankruptcy court having "actual or constructive possession" of the bankruptcy estate and

its power and obligation to consider objections by the trustee in deciding whether to allow claims

against the estate.  492 U.S. at 57.  Objections by the trustee to a debtor's exemptions are cut from the

same equitable cloth.  For these reasons, I conclude the Defendants have no right to a jury trial on Count

VIII of the Complaint.

### E.   Objection to Debtors' Discharge

Finally, in Count IX of the Complaint, the Trustee seeks an order denying the Debtors a discharge

pursuant to 11 U.S.C. § 727(a) on the grounds that they concealed Ernest's interest in the Family Trust

and Mandalay Drive and transferred a portion of that interest subsequent to the petition date with the

intent to hinder, delay, or defraud a creditor and the Trustee, and on the further ground that they made

a false oath when they signed the 2008 Affidavit declaring that neither was aware of who the

beneficiaries to the 2001 Trust and Family Trust were.

### 1.   Authority of the Bankruptcy Court to Decide the Debtors' Right to Discharge

#### (a)   Statutory Authority Under 28 U.S.C. § 157

Objections to discharge are core proceedings.  *See* 28 U.S.C. § 157(b)(2)(J); *Kontrick v. Ryan*, 540

U.S. 443, 444 (2004).

#### (b)   Constitutional Authority

Such proceedings do not "augment" the bankruptcy estate.  *See Stern*, 131 S. Ct. at 2618.

Objections to discharge stem from the bankruptcy, arising out of 11 U.S.C. § 727(a), which lists twelve

circumstances in which a discharge may not enter.  Congress, pursuant to its Article I power to enact

laws of bankruptcy, has the ability to establish the conditions under which a debtor shall receive a

discharge and to assign the determination of whether those conditions are met to a non-Article III judge.

Accordingly, I find that I may enter final judgment as to Count IX consistent with Article III of the

Constitution.  *Cf. Ritz v. Lee (In re Ritz)*, 459 B.R. 623, 631 (Bankr. S.D. Tex. 2011) (finding constitutional

authority to enter final judgment in a proceeding brought by a creditor to determine nondischargeability of a particular debt and commenting "[d]eterminations of whether a debtor meets the conditions for a discharge are integral to the bankruptcy scheme . . . the Bankruptcy Court has the authority to determine when the statutorily established right to a discharge does *not* apply.").   Accordingly, because objections to discharge are core proceedings that stem from the bankruptcy itself, I can enter a final order consistent with Article III of the Constitution.

   **2.   Whether the Debtors Have a Right to a Trial by Jury**

   Both the Sixth and Seventh Circuits have considered this issue and determined that a debtor has no Seventh Amendment right to a jury trial in a proceeding to determine dischargeability.   I agree with the reasoning  set forth in the Seventh Circuit's decision in *Hallahan*, adopted by the Sixth Circuit in *In re McLaren*, 3 F.3d 958, 960-61 (6th Cir. 1993).   In *Hallahan* the Seventh Circuit held that the defendant-debtor had no right to a trial by jury to determine the dischargeability of a claim against his estate resulting from the willful breach of a covenant not to compete.   *See* 936 F.2d at 1505.   The Court noted that under the *Granfinanciera* test:

> [D]ischargeability proceedings are unlike actions to recover preferential transfers in that historically they have been equitable actions tried without juries:
>
>> [A] bankruptcy discharge and questions concerning the dischargeability of certain debts, involve issues with an equitable history and for which there was no entitlement to a jury trial in the courts of England prior to the merger of law and equity.
>
> *In re Hooper*, 112 B.R. 1009, 1012 (Bankr. 9t h Cir. 1990); *In re Johnson*, 110 B.R. 433, 434 (Bankr. W.D. Mo. 1990); *In re Brown*, 103 B.R. 734 (Bankr. W.D. Md. 1989), *see also* Countryman, *The New Dischargeability Law*, 45 Am. Bankr. L.J. 36-39 (1971).   The relief sought is also equitable since the sense of a dischargeability claim is a declaration that the debt is indeed dischargeable or non-dischargeable.   *Hooper*. 112 B.R. at 1012.

*See id.*  In *In re Watson*, the bankruptcy court relied on *Hallahan* to deny a jury trial in a proceeding to

deny discharge, commenting:

> [The fact that a proceeding to deny discharge sounds in equity] is more
> obvious in [a] proceeding to deny the discharge completely.  11 U.S.C. §
> 727; Fed. R. Bankr. P. 4004 & 7001(4).  Past bankruptcy statutes created
> the right to a jury trial because the issues would have been legal issues
> in other types of proceedings.  The statutes recognized that the parties
> did not have the constitutional right to a jury trial because discharge
> proceedings were equitable.  *In re Holst*, 11 F. 856 (W.D. Tenn. 1882); *In
> re George*, 10 F.Cas. 193 (D. Mass. 1869); *In re Lothrop*, 15 F.Cas. 961 (D.
> Mass. 1842).

2007 WL 398994, *1 (S.D. Tex. Feb. 1, 2007) *quoting In re Brandy*, 237 B.R. 661, 669 (Bankr. E.D. Tenn.

1999).

In light of the Sixth and Seventh Circuit decisions denying jury trials in proceedings to determine

dischargeability of particular debts and the lengthy discussion of bankruptcy's equitable roots elsewhere

in this opinion, I conclude that the Debtors have no right to a jury trial in a proceeding to deny them a

discharge.

**IV.     CONCLUSION**

For the reasons set forth above, the Court has authority to enter final orders and judgments

with respect to Counts III, VII, VIII and IX; and, on Count I, the Court may make a final determination as

to whether Ernest's interest in the Family Trust is property of the estate.  As to Count II and the

remainder of Count I, the Court is limited to hearing the matters and submitting proposed findings of

fact and conclusions of law to the district court for entry of final order or judgment.  The Seventh

Amendment does not afford the Defendants a right to trial by jury on any count.

Date:  October 5, 2012

_____
Frank J. Bailey
United States Bankruptcy Judge